**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MICHAEL PANES, Derivatively on Behalf of INOVIO PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> JACQUELINE E. SHEA, PETER KIES, SIMON X. BENITO, ROGER D. DANSEY, ANN C. MILLER, JAY SHEPARD, DAVID B. WEINER, WENDY L. YARNO, and LOTA S. ZOTH, <br><br> Defendants, <br><br> and <br><br> INOVIO PHARMACEUTICALS, INC., <br><br> Nominal Defendant. | Case No: <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff Michael Panes ("Plaintiff"), by and through Plaintiff's undersigned counsel, derivatively on behalf of and for the benefit of Nominal Defendant Inovio Pharmaceuticals, Inc. ("Inovio" or the "Company"), submits this Verified Shareholder Derivative Complaint against Jacqueline E. Shea ("Shea"), Peter Kies ("Kies"), Simon X. Benito ("Benito"), Roger D. Dansey ("Dansey"), Ann C. Miller ("Miller"), Jay Shepard ("Shepard"), David B. Weiner ("Weiner"), Wendy L. Yarno ("Yarno"), and Lota S. Zoth ("Zoth") (the "Individual Defendants" and together with Inovio, "Defendants") for and among other things, their breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own

1

acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of filings by Inovio with the United States Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts and shareholder communications, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought against certain current and former Inovio officers and members of Inovio's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants from October 10, 2023 through December 29, 2025 (the "Relevant Period").

2.      Inovio is a biotechnology company that focuses on the development and commercialization of various DNA-based treatments, particularly treatments and preventative care for Human Papillomavirus ("HPV")-associated diseases, cancer, and other infectious diseases.

3.      Inovio's lead product candidate is INO-3107, a DNA immunotherapy designed to treat recurrent respiratory papillomatosis ("RRP"). RRP is a rare, HPV-caused disease, the symptoms of which generally include recurrent wart-like growths in the respiratory tract known as papillomas. In some cases, RRP papillomas can obstruct airways and cause life-threatening respiratory complications. The chronic nature of the disease derives from the fact that patients are generally incapable of inducing an effective immune response to HPV-6 and HPV-11, the diseases that cause RRP, on their own. INO-3107 purportedly works by eliciting the generation of T cells in a patient's body that specifically target and kill cells infected with HPV-6 and HPV-11.

4.      Currently, the standard treatment for RRP is multiple invasive surgeries. According

to recent data, there are an estimated 14,000 active cases of RRP across adult and juvenile patients, with roughly 1.8 new cases per 100,000 adults each year. According to Inovio, INO-3107 has the potential to transform treatment of RRP for these individuals by reducing the number of surgeries needed to treat the condition.

5.      A Biologics License Application ("BLA") is a standard application promulgated and reviewed by the Federal Drug Administration ("FDA") for any entity seeking to introduce a biological product into interstate commerce within the United States. A BLA includes the following components: (1) applicant information; (2) product/manufacturing information; (3) pre-clinical studies; and (4) labeling.

6.      As described in greater detail herein, Inovio represented to investors throughout the Relevant Period that it intended to make use of the FDA's Accelerated Approval program for BLAs. The main purpose of the Accelerated Approval program is to provide a quicker timeline to approval for drugs treating serious conditions with unmet medical needs. According to the FDA, by granting approval based on surrogate endpoints, such as laboratory measurements, radiographic images, or physical signs, the Accelerated Approval program can considerably shorten the time required prior to receiving FDA approval.

7.      Throughout the Relevant Period, the Individual Defendants repeatedly emphasized that it was likely INO-3107's BLA would be placed on the Accelerated Approval pathway by the FDA. The Company also highlighted that, if approved, INO-3107 would be the Company's first product to receive regulatory approval and the first DNA medicine in the United States.

8.      On January 3, 2024, Inovio issued a press release announcing the Company's intention to submit a BLA for INO-3107 "in the second half of 2024 and request a Priority Review" and quoting Defendant Shea as stating "[b]ased on productive discussions with the FDA, we

believe we now have established a path to submitting a BLA for INO-3107 under the accelerated approval program," and "[o]ur plan is to complete the submission of our BLA in the second half of 2024 and request a Priority Review."

9.     From January 2024 until August 2024, the Individual Defendants repeatedly claimed that Inovio would be able to achieve a rolling submission of the INO-3107 BLA by the second half of 2024. Then, on August 8, 2024, the Company revealed that it would not be able to submit the INO-3107 BLA until mid-2025 – a full year after its initial planned submission date. In a press release issued that day, Inovio claimed it had "recently identified a manufacturing issue" with a component of INO-3107, which would "take additional time to rectify."

10.    Nevertheless, the Company maintained that this problem was "resolvable," and continued to highlight in its public disclosures that it anticipated the FDA would grant its request for expedited review of the INO-3107 BLA. In March 2025, Inovio announced that it had resolved the manufacturing issue and was "back on track to submitting [its] first BLA for INO-3107 to the FDA." The Company told investors the FDA had "agreed to [its] rolling submission plan" for the BLA in August 2025, and announced that it had "submitted the BLA under the FDA's Accelerated Approval program and [] requested a priority review" in November 2025.

11.    The truth fully emerged on December 29, 2025, when Inovio issued a press release announcing that it had not been granted priority review under the FDA's Accelerated Approval program. The Company informed investors that the FDA had preliminarily concluded that the BLA did not contain "adequate information to justify eligibility for the accelerated approval pathway." On this news, the price of the Company's stock fell $0.56 per share, or approximately 24.5%, from a close of $2.29 per share on December 26, 2025, to close at $1.73 per share on December 29, 2025.

12.     As a result of the foregoing, the Company, as well as Defendants Shea and Kies, were named as defendants a federal securities fraud class action lawsuit pending in this Court, captioned *Carlson v. Inovio Pharmaceuticals, Inc., et al.*, Case No. 2:26-cv-00803-JP (the "Securities Class Action.") The Securities Class Action has further subjected Inovio to the need to undertake internal investigations and the need to implement adequate controls, as well as exposed the Company to massive class-wide liability.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §78n(a)(1)) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) Inovio maintains its principal place of business in this District; (ii) one or more of the defendants either

resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

18. Plaintiff is a current shareholder of Inovio and has continuously held Inovio common stock since November 2022.

19. Nominal Defendant Inovio is a Delaware corporation with its principal executive offices located at 660 W. Germantown Pike, Suite 110, Plymouth Meeting, Pennsylvania 19462. The Company's common stock trades on the Nasdaq under the ticker symbol "INO."

20. Defendant Shea has served as the Company's Chief Executive Officer ("CEO") and as a Company director since 2022. According to the proxy statement filed on Schedule 14A with the SEC on April 7, 2026 (the "2026 Proxy Statement"), in 2025, Defendant Shea received $1,587,155 in total compensation from the Company.

21. Defendant Kies has served as the Company's Chief Financial Officer ("CFO") since 2002. According to the 2026 Proxy Statement, in 2025, Defendant Kies received $833,684 in total compensation from the Company.

22. Defendant Benito has served as a Company director since 2003. Defendant Benito also serves as the Chair of the Board's Nomination and Corporate Governance Committee and as a member of both its Audit Committee and Compensation Committee. According to the 2026 Proxy Statement, in 2025, Defendant Benito received $117,500 in total compensation from the Company.

23. Defendant Dansey has served as a Company director since 2021. Defendant

6

Dansey also serves as a member of the Board's Nomination and Corporate Governance Committee. According to the 2026 Proxy Statement, in 2025, Defendant Dansey received $72,095 in total compensation from the Company.

24.    Defendant Miller has served as a Company director since 2019. According to the 2026 Proxy Statement, in 2025, Defendant Miller received $67,500 in total compensation from the Company.

25.    Defendant Shepard has served as a Company director since 2020. Defendant Shepard also serves as a member of both the Board's Audit Committee and Nomination and Corporate Governance Committee. According to the 2026 Proxy Statement, in 2025, Defendant Shepard received $80,000 in total compensation from the Company.

26.    Defendant Weiner has served as a Company director since 2016. According to the 2026 Proxy Statement, in 2025, Defendant Weiner received $52,500 in total compensation from the Company.

27.    Defendant Yarno has served as a Company director since 2017. Defendant Yarno also serves as the Chair of the Board's Compensation Committee and as a member of its Nomination and Corporate Governance Committee. According to the 2026 Proxy Statement, in 2025, Defendant Yarno received $82,500 in total compensation from the Company.

28.    Defendant Zoth has served as a Company director since 2019. Defendant Zoth also serves as the Chair of the Board's Audit Committee and as a member of its Compensation Committee. According to the 2026 Proxy Statement, in 2025, Defendant Zoth received $77,500 in total compensation from the Company.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of their positions as officers, directors, and/or fiduciaries of Inovio and

because of their ability to control the business and corporate affairs of Inovio, the Individual Defendants owed Inovio and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Inovio in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Inovio and its shareholders.

30.     Each director and officer of Inovio owes to Inovio and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of Inovio and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

31.     The Individual Defendants, as officers and/or directors of a publicly held company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, had a duty to promptly disseminate accurate and truthful information regarding Inovio's operations, finances, financial condition, financial statements, performance, growth, earnings, internal controls, and present and future business prospects so that the market price of Inovio's stock would be based on truthful, accurate, and fairly presented information.

32.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Inovio, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Inovio. Because of their advisory, executive, managerial and directorial positions with Inovio, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of Inovio.

33.     The Individual Defendants, as officers and/or directors of Inovio, were required to discharge their duties by exercising reasonable and prudent supervision over the management,

8

policies, practices, and controls of the financial affairs of Inovio. By virtue of such duties, the officers and directors of Inovio were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, ethical, and businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide the public, investors, and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of internal legal, financial, and management controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

34.     Each Individual Defendant, by virtue of his or her position as a director and/or

9

officer, owed to Inovio and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.

35.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Inovio, the absence of good faith on their part, and a reckless disregard for their duties to Inovio and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

36.     The Individual Defendants breached their duties of loyalty and good faith by causing Inovio to issue false and misleading statements concerning its financial condition. As a result, Inovio has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## THE CODE OF BUSINESS CONDUCT AND ETHICS

37.     Inovio maintains a Code of Business Conduct and Ethics (the "Code of Conduct"), which states that it "applies to all officers, directors, and employees" of the Company.

38.     In a section titled "Comply with Laws, Rules, Regulations and Ethics," the Code of Conduct provides the following, in relevant part:

> As a publicly traded U.S.-based company in a highly regulated industry that operates globally, the Company's conduct is subject to many laws, rules, and regulations. The Company requires all employees – regardless of job, title, or function – to comply with all laws, rules, and regulations applicable to the Company wherever it does business. Obeying the law, both in letter and in spirit, is the foundation on which the Company's ethical standards are built.

39.     In a section titled "Public Communications," the Code of Conduct provides the following:

> The Company is subject to many regulations regarding how it communicates about its investigational products, clinical trials, and other business conduct. External

10

communications about the Company's progress and investigational products must always be science-based, objective, fair, balanced, and not include claims of safety and efficacy.

You must never appear to speak publicly for the Company unless you are expressly authorized to do so. Company information, even that intended for business use, should only be communicated to the public by authorized Company spokespersons after review by the Vice President, Strategic Relations and/or the Chief Executive Officer. If you are asked to make an external presentation or write an article, first consult your supervisor, and be sure to follow applicable internal review procedures. If you are approached by the media, be courteous and professional, but do not volunteer information. Refer any media inquiries to the Vice President, Strategic Relations. When using social media personally, you must never suggest that you are speaking on behalf of the Company.

When using social media and communicating with the public, you should use good judgment and common sense and avoid any posts that would be illegal, violate this Code, or embarrass the Company. You must never disclose confidential information of the Company or that of employees, subsidiaries or affiliates on social media. When posting on social media about the Company or its products, you should clearly say that you are an INOVIO employee but that your post is your own personal opinion. Nothing in these requirements, however, should be interpreted to prevent you from engaging in activities that are protected under the law.

40.    In a section titled "Clinical Research," the Code of Conduct provides the following:

INOVIO is working to reshape the future of treating and preventing cancer and infectious diseases. To achieve our mission, the science we perform must rest on a solid foundation of integrity. INOVIO is committed to conducting research and clinical studies in compliance with all applicable laws and regulations. We protect the health and welfare of those individuals who participate in our research efforts and clinical trials. We audit and monitor clinical study sites and processes related to our clinical trials.

Demonstrating its commitment to the quality and integrity of its clinical research, INOVIO has established a Clinical Compliance function, which (1) develops and approves an array of standard operating procedures (known as Controlled Clinical Documents) that align with Good Clinical Practices; (2) facilitates GCP training, knowledge checks, and responses to audits; and (3) scrupulously documents its work to put INOVIO in position to demonstrate compliance with regulatory requirements and be ready for inspection.

41.    In a section titled "Insider Trading," the Code of Conduct provides the following,

in relevant part:

As a U.S. public company, INOVIO and all its employees must comply with U.S. securities laws. This includes prohibitions on "insider trading," which is the

11

purchase or sale of a company's stock made with knowledge of nonpublic material information about the company. "Material" information includes anything likely to influence a potential investor's decision to buy or sell stock. Just as it is improper for you to financially benefit from inside information, it is also improper for your friends, family, or news sources to profit. Trading on the basis of inside information is a criminal offense, and will result in immediate termination.

42.     In a section titled "Financial Reporting and Controls," the Code of Conduct provides the following, in relevant part:

The Company requires honest and accurate recording and reporting of financial and other information in order to make responsible business decisions and full, fair, accurate, timely, and understandable financial and other disclosures to regulatory agencies and the public. The Company will maintain internal controls to ensure that transactions are properly authorized, assets are safeguarded, operations are conducted in accordance with Board of Directors and management directives and financial records are reliable. All of the Company's books, records, accounts, and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions, and must conform both to applicable legal requirements and to the Company's system of internal control.

The Company will maintain disclosure controls to ensure that required information is recorded, processed, summarized, and reported as required by law and regulation and within the time periods specified. Required information will be timely communicated to management as appropriate to allow timely decisions regarding disclosure. Financial statements for external purposes will be fairly presented in conformity with generally accepted accounting principles accepted in the United States or other applicable standards as required by law or regulation. Public statements and filings regarding the Company's business and financial status must be true, accurate, complete, timely, understandable, and not misleading. Unrecorded or "off the books" funds or assets will not be maintained unless permitted by applicable law or regulation. No false or fictitious entries may be made on the Company books and records.

43.     In a section titled "Protection and Proper Use of Company Assets," the Code of Conduct provides the following:

You must protect the Company's assets and ensure their efficient and lawful use. Theft, carelessness, and waste have a direct impact on the Company's profitability. Any suspected incident of fraud, theft, or improper use of Company assets should be immediately reported to your supervisor, the Legal Department, or via the reporting hotline.

Company equipment, including communications and computer equipment, goods, and services should not be used for non-Company business. Incidental personal use is permissible, but must remain reasonable, limited, appropriate and ethical, and not

12

affect business transactions or your productivity. Using Company assets or information for personal gain is prohibited.

All transactions must be properly authorized. You must be aware of the limits of your authority.

## THE AUDIT COMMITTEE CHARTER

44. The Company also maintains an Audit Committee Charter (the "Charter"), which states that the Audit Committee is "responsible for oversight of all account reporting, financial and internal control practices of the Company and its subsidiaries."

45. In a section titled "Authority and Responsibilities," the Charter provides the following, in relevant part:

### Financial Statement and Disclosure Matters

(a) Meet to review and discuss with management and the independent auditors the annual audited financial statements and quarterly financial statements prior to the filing of such financial statements with the SEC, including reviewing the specific disclosures made in Management's Discussion and Analysis of Financial Condition and Results of Operations, and recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K. Also, the Committee shall discuss the results of the quarterly reviews and approve the Company's Quarterly Reports on Form 10-Q. The Committee shall also discuss any other matters required to be communicated to the Committee by the independent registered public accountants under the standards of the Public Company Accounting Oversight Board (PCAOB) (United States).

(b) Discuss with management and the independent auditors any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements and any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, any major issues as to the adequacy of the Company's internal controls and any special steps audit adopted or which need to be adopted in light of material control deficiencies.

(c) Effect or cause to be effected any revisions to the Company's financial statements which the Committee deems necessary or advisable after consultation with the Company's independent auditors or the Committee's advisors.

(d) Prior to the filing of Form 10-Q and Form 10-K, review and discuss quarterly and annual reports from the independent auditors on:

(i) All critical accounting policies and practices to be used, including

discussion with the independent auditors any accounting adjustments that were noted or proposed by the Auditors but were "passed" (as immaterial or otherwise).

(ii) All alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors.

(iii) Other material written communications between the independent auditors and management such as any management letter or schedule or unadjusted differences.

(e) Discuss with management the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be done generally (consisting of discussing the types of information to be disclosed and the types of presentations to be made).

(f) Discuss with management and the independent auditors the effect of regulatory and accounting initiatives as well as off-balance sheet structures on the Company's financial statements.

(g) Discuss with the independent auditors the matters required to be discussed by Statement on Auditing Standards No. 16 relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

(h) Review and discuss annually with management its assessment of the effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures under Section 404 of the Sarbanes-Oxley Act of 2002 and the rules and regulations thereunder, including:

(i) Review annually with the independent auditors their opinion and report on the effectiveness of the Company's internal control over financial reporting; and

(ii) Consider whether any changes to the internal control over financial reporting or disclosure controls and procedures are appropriate in light of management's assessment or the independent auditors' report.

(i) Review disclosures made to the Committee by the Company's CEO and CFO during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls. Discuss with management the related remediation plan of any significant deficiencies or material weaknesses.

**(j)** Review the Company's procedures for monitoring compliance with the Foreign Corrupt Practices Act and other applicable anti-corruption laws.

**(k)** Oversee the Company's finance function, which may include the annual review of the Company's investment policy.

**(l)** Meet separately and periodically with management of the Company, the employees of the Company responsible for the internal audit and the Company's independent auditors.

**(m)** Review and approve all related party transactions required to be disclosed pursuant to SEC Regulation S-K, Item 404, and discuss with management the business rationale for the transactions and whether appropriate disclosures have been made.

**(n)** Discuss with management, the internal auditors, and the independent registered public accountants any (1) changes in internal control over financial reporting that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting that are required to be disclosed and (2) any other changes in internal control over financial reporting that were considered for disclosure in the Company's period filings with the SEC.

**(o)** Inquire of financial management and the independent auditors regarding the Company's significant financial risk exposures, including its anti-fraud programs and controls, and assess the steps management has taken to minimize and control such risks.

**(p)** Periodically review and evaluate the Company's other risk assessment and risk management policies and programs, including but not limited to the Company's policies and programs for identifying and addressing cybersecurity risks.

***

*Compliance Oversight Responsibilities*

**(a)** Obtain from the independent auditors assurance that Section 10A(b) of the Exchange Act, which addresses the discovery and disclosure of any illegal act, has not been implicated.

**(b)** Obtain reports from management, the Company's senior internal auditing executive and the independent auditors that such persons are in compliance with applicable legal requirements and the Company's Code of Business Conduct and Ethics. Such reports shall also confirm that, to such person's knowledge, the Company and its subsidiary and affiliated entities are in conformity with applicable legal requirements and the Company's Code of Business Conduct and Ethics. Review reports and disclosures of insider and affiliated party transactions or other conflicts of interest. Advise the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and with the

15

Company's Code of Business Conduct and Ethics, including the consideration of a waiver in the Code of Business Conduct and Ethics.

(c) Establish, review, and, as necessary, update procedures for the receipt, retention and treatment of complaints received by the Company from employees of the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of or advisors to the Company of concerns regarding questionable accounting or auditing matters (i.e., the Company's whistleblower program).

(d) Discuss with management and the independent auditors any correspondence with regulators or governmental agencies and any published reports, which raise material issues regarding the Company's financial statements or accounting policies.

(e) Discuss quarterly in separate sessions with the Company's General Counsel and outside counsel legal matters that may have a material impact on the financial statements, or the Company's compliance policies.

(f) Evaluate complaints received by the Company from employees of the Company regarding accounting, internal accounting controls or auditing matters, and any confidential, anonymous submissions by employees of or advisors to the Company of concerns regarding questionable accounting or auditing matters, and where deemed necessary and appropriate, initiate investigation into such matters, either by the Committee, via formation of a special committee, via recommendation to the Board of Directors for formation of a special committee, or through the engagement of a third party to conduct an independent investigation.

(g) The Committee will receive, review and discuss with the Company's General Counsel attorneys' reports of evidence of material violations of securities laws and breaches of fiduciary duty and similar violations of U.S., state or other applicable law.

(h) The Committee will investigate any matter brought to the attention of the Committee within the scope of its duties if, in the judgment of the Committee, such investigation is necessary or appropriate.

## SUBSTANTIVE ALLEGATIONS

46.     On October 10, 2023, the Company issued a press release (the "October 2023 Press Release"). The October 2023 Press Release stated, in relevant part:

INOVIO . . . has received feedback from the [FDA] that data from its completed Phase 1/2 trial of INO-3107 for the treatment of RRP could support INOVIO's submission of a BLA for review under the FDA's accelerated approval program. The FDA also advised that the company's previously planned Phase 3 randomized, placebo-controlled trial would not be required to support this submission. INOVIO

16

will be required to initiate a confirmatory trial prior to BLA submission for accelerated approval and satisfy all other FDA filing requirements. If approved, INO-3107 would be the first DNA medicine in the United States and the first INOVIO candidate to receive regulatory approval.

47.    Defendant Shea was quoted in the October 2023 Press Release, highlighting Inovio's "focus[] on streamlining [the Company's] development plan to support submission of a BLA for accelerated approval."

48.    On November 9, 2023, the Company issued a press release announcing its financial results for the third quarter of 2023 (the "November 2023 Press Release"). The November 2023 Press Release noted that the Company had "[r]eceived FDA feedback that data from [a] completed Phase 1/2 trial could be used to submit a [BLA] under [the] Accelerated Approval program" and told investors it was "[a]ccelerating [its] commercialization strategy in preparation for an earlier launch[.]"

49.    The November 2023 Press Release also stated the following:

The FDA advised that completion of a Phase 3 trial would not be required to support th[e BLA] submission. INOVIO will be required to initiate a confirmatory trial prior to BLA submission for accelerated approval and satisfy all other FDA filing requirements. Subsequent to this feedback, INOVIO has been focused on preparing to file its BLA under the accelerated approval program. The company anticipates additional meetings with the FDA to finalize next steps, including an Initial Comprehensive Multidisciplinary Breakthrough Therapy Meeting, or Type B meeting, which it has requested to be held in the fourth quarter of 2023. INOVIO plans to pursue other benefits offered by Breakthrough Therapy designation to quickly resolve any future questions, as well as take advantage of the opportunity to submit under the FDA's Rolling Review program and request a Priority Review once the BLA is fully submitted.

50.    Moreover, the November 2023 Press Release quoted Defendant Shea as stating the following, in relevant part:

Following Breakthrough Therapy designation from the FDA in September and subsequent feedback that we no longer need to complete a Phase 3 trial prior to submitting a BLA under the accelerated approval program, our team is laser-focused on next steps. These steps include holding an Initial Comprehensive

17

Multidisciplinary Breakthrough Therapy Meeting with the FDA in the near future to confirm alignment on our accelerated development plans and to clarify timing associated with potentially making INO-3107 available to patients suffering from this devastating disease.

51.     Also on November 9, 2023, the Company filed a quarterly report on Form 10-Q with the SEC for the third quarter of 2023 (the "3Q23 10-Q"). The 3Q23 10-Q was signed by Defendants Shea and Kies. Appended to the 3Q23 10-Q were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Shea and Kies, attesting to the accuracy of the statements contained therein.

52.     The 3Q23 10-Q reiterated that "data from [the Company's] completed Phase 1/2 clinical trial of INO-3107 for the treatment of RRP can be used to support the submission of a . . . BLA[] for review under the FDA's accelerated approval program[,]" and that "[t]he FDA also advised that we will no longer be required to conduct our previously planned Phase 3 randomized, placebo-controlled trial[.]"

53.     The 3Q23 10-Q also warned of certain risks that "may" or "could" materialize in connection with seeking accelerated approval for the INO-3107 BLA "if" certain conditions occurred. However, the 3Q23 10-Q also downplayed these risks:

We plan to pursue accelerated approval for our product candidate INO-3107[.]

* * *

If we pursue accelerated approval for INO-3107 for the treatment or [sic] RRP . . . we would do so on the basis that there is no available therapy for that disease or condition or that our product candidate provides a benefit over available therapy. If standard of care were to evolve or if any of our competitors were to receive full approval on the basis of a confirmatory trial for a drug or biologic for a disease or condition for which we are seeking accelerated approval before we receive accelerated approval, the disease or condition would no longer qualify as one for which there is no available therapy, and accelerated approval of our product candidate would not occur without a showing of benefit over available therapy. The treatment landscape can change quickly as the FDA converts accelerated approvals to full approvals on the basis of successful

18

confirmatory trials.

We have received feedback from the FDA that data from our completed Phase 1/2 clinical trial of INO-3107 for the treatment of RRP can be used to support the submission of a BLA for review under the accelerated approval program; however, whether any trial is sufficient to receive FDA approval under the accelerated approval pathway will depend on the safety and efficacy results of such trial and will only be determined by the FDA upon review of a submitted BLA.

\* \* \*

In addition, the FDA may terminate the accelerated approval program or change the standards under which accelerated approvals are considered and granted in response to public pressure or other concerns regarding the accelerated approval program. Changes to or termination of the accelerated approval program could prevent or limit our ability to obtain accelerated approval of any of our clinical development programs.

54.     On January 3, 2024, the Company issued a press release (the "January 2024 Press Release"). The January 2024 Press Release stated, for the first time, that Inovio planned to submit its INO-3107 BLA "in the second half of 2024[,] . . . follow[ing] an Initial Comprehensive Multidisciplinary Breakthrough Therapy (Type B) Meeting with the FDA on critical aspects of the data package required to submit a BLA under the agency's accelerated approval program."

55.     On March 6, 2024, the Company issued a press release (the "March 2024 Press Release"). In the March 2024 Press Release, Defendant Shea reiterated Inovio's plan to submit a BLA "in the second half of 2024." The March 2024 Press Release further announced Inovio's plan to "accelerate commercialization efforts for a potential 2025 launch" and quoted Defendant Shea as stating that in the past year, the Company had "taken [its] lead candidate, INO-3107 for RRP, from positive Phase 1/2 trial results to Breakthrough Therapy designation and an established path to BLA submission under the FDA's accelerated approval program."

56.     Also on March 6, 2024, the Company filed an annual report on Form 10-K with the SEC for the fourth quarter of and year ended December 31, 2023 (the "2023 10-K"). The 2023 10-

K was signed by each of the Individual Defendants. Appended to the 2023 10-K were SOX certifications, signed by Defendants Shea and Kies, attesting to the accuracy of the statements contained therein.

57.    The 2023 10-K further highlighted the purported quality and reliability of the Company's CELLECTRA® devices, reporting, among other things, that the "devices have been designed to optimize delivery of our DNA medicine candidates depending on the target disease" and "are validated and manufactured under Current Good Manufacturing Practices (cGMP)." The 2023 10-K elaborated:

> In 2023, we began accelerating the development of our commercialization plans for INO-3107 in the United States following notice from the FDA that the data from our completed Phase 1/2 trial in patients with RRP could be used to submit a BLA under the accelerated approval program.
>
> We believe our plasmids can be produced in commercial quantities through uniform methods of fermentation and processing that are applicable to all plasmids. We believe we will be able to obtain sufficient supplies of plasmids for all foreseeable clinical investigations.

58.    The 2023 10-K also contained the same boilerplate risk warnings as contained in the 3Q23 10-Q.

59.    On May 13, 2024, the Company issued a press release to announce its financial results for the first quarter of 2024 (the "May 2024 Press Release"). Regarding the INO-3107 BLA and the Company's plans to manufacture INO-3107, the May 2024 Press Release stated the following, in relevant part:

> INOVIO remains on target to submit its BLA seeking accelerated approval for INO-3107 in the second half of 2024. INOVIO is preparing trial sites for recruitment based on recent feedback from the FDA that they had no additional comments on INOVIO's proposed design for the confirmatory trial. The trial is being strategically designed to focus on evaluating clinical benefit in reducing surgical intervention to control RRP disease for the majority of RRP patients. Repeat surgical interventions is the current standard of care for RRP. INOVIO's market research to date with patients and healthcare professionals indicates that a

reduction of even one surgery matters, because every surgery poses a significant risk of causing permanent damage to the vocal cords.

* * *

INOVIO continues preparations to be ready to launch commercially in 2025, should INO-3107 be approved. Efforts are focused on building the infrastructure needed to deliver the product to patients as quickly and easily as possible, from distribution and supply efforts to payer and healthcare provider support. INOVIO believes that INO-3107, if approved, has the potential to be the preferred treatment of choice for all patients with RRP, as well as healthcare professionals and payers based on results from completed clinical trials and the competitive strengths of the DNA medicine platform[.]

60.     The May 2024 Press Release also quoted Defendant Shea as stating the following, in relevant part:

In the first quarter of 2024, we continued to deliver on our priorities for the year. Of utmost importance, we remain on track to submit our BLA in the second half of 2024 under the accelerated approval pathway for INO-3107 as a treatment for RRP and are working to initiate our confirmatory trial as soon as possible based on feedback from the FDA on the trial's design. We are energized by the opportunity to potentially deliver the first FDA-approved therapy for this devastating disease and continue to work expeditiously to be prepared to serve RRP patients and the physicians caring for them. If approved, INO-3107 would also be the first DNA medicine on the market in the United States, representing a major milestone for our technology platform[.]

61.     Also on May 13, 2024, the Company filed a Quarterly Report on Form 10-Q with the SEC for the first quarter of 2024 (the "1Q24 10-Q"). The 1Q24 10-Q was signed by Defendants Shea and Kies. Attached to the 1Q24 10-Q were SOX certifications signed by Defendants Shea and Kies, attesting to the accuracy of the statements contained therein.

62.     The 1Q24 10-Q stated, among other things, that "[w]e have received feedback from the FDA that data from our completed Phase 1/2 clinical trial of INO-3107 for the treatment of RRP can be used to support the submission of a BLA for review under the accelerated approval program[,]" and that "[a]s part of submitting our BLA under the accelerated program, which we plan to do in the second half of 2024, we will need to satisfy all FDA filing requirements and

21

initiate a confirmatory clinical trial prior to BLA submission."

63.    The 1Q24 10-Q also contained the same boilerplate provisions pertaining to risk warnings as noted in the 3Q23 10-Q.

64.    The statements referenced above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, Defendants failed to disclose to investors that: (i) the Company lacked a sufficient basis to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (ii) Defendants knew the INO-3107 BLA would be unlikely to receive accelerated approval or priority review from the FDA; (iii) INO-3107's financial prospects were greatly exaggerated; (iv) as a result, the Company's overall financial assertions were inaccurate; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis at all relevant times.

***The 2024 Proxy Statement***

65.    On April 11, 2024, the Company filed a proxy statement on Schedule 14A with the SEC (the "2024 Proxy Statement"). Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth solicited proxies to vote at the annual stockholder meeting via the 2024 Proxy Statement.

66.    The 2024 Proxy Statement asked Inovio stockholders to vote to re-elect Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth to the Board and approve, on an advisory basis, the compensation of the Company's named executive officers.

67.    With respect to the "Board['s] Role in Risk Management," the 2024 Proxy Statement stated the following:

> The risk oversight function of our Board is carried out by both the Board and the Audit Committee. Management prepares and presents an annual business plan to

22

the Board, which identifies risks associated with our operations and is reviewed quarterly by the Board. As provided in its charter, the Audit Committee meets periodically with management to discuss major financial and operating risk exposures and the steps, guidelines and policies taken or implemented related to risk assessment and risk management. Matters of strategic risk are considered by our Board. Each quarter management reports to the Audit Committee on legal, finance, accounting and tax matters. Our Board is provided with reports on legal matters at least quarterly and on other matters related to risk oversight on an as needed basis.

68.    With respect to the Company's Code of Conduct, the 2024 Proxy Statement

provided:

We have adopted a Code of Business Conduct and Ethics, which applies to all directors, officers and employees, including the principal executive officer, principal financial and accounting officer and controller. The purpose of the Code is to promote honest and ethical conduct. The Code of Business Conduct and Ethics is available on our website and is also available in print, without charge, upon written request to our corporate secretary at 660 W. Germantown Pike, Suite 110, Plymouth Meeting, Pennsylvania 19462. Any amendments to or waivers of the Code will be promptly posted on our website at www.inovio.com or in a report on Form 8-K, as required by applicable laws.

69.    With respect to the Audit Committee, the 2024 Proxy Statement provided, in

relevant part:

The functions of the Audit Committee include retaining our independent registered public accounting firm, reviewing its independence, reviewing and approving the planned scope of our annual audit, reviewing and approving any fee arrangements with our independent registered public accounting firm, overseeing its audit work, reviewing and pre-approving any non-audit services that may be performed by it, reviewing the adequacy of accounting and financial controls, reviewing our critical accounting policies and reviewing and approving any related party transactions. The Audit Committee acts pursuant to a written charter that is available on our corporate website at: http://www.inovio.com.

70.    The 2024 Proxy Statement was materially misleading as it failed to disclose that:

(i) although Inovio claimed its officers and directors adhered to the Code of Conduct, the

Individual Defendants were actively violating the Code of Conduct at the time; (ii) contrary to the

2024 Proxy Statement's descriptions of the Board's risk oversight responsibilities, the Board and

23

its committees did not adequately exercise these functions and were causing or permitting Inovio to issue false and misleading statements; and (iii) the Individual Defendants allowed Defendants Shea and Kies to sell stock at artificially inflated prices while in possession of material nonpublic information.

71.     Further, the 2024 Proxy Statement failed to disclose that: (i) the Company lacked a sufficient basis to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (ii) Defendants knew the INO-3107 BLA would be unlikely to receive accelerated approval or priority review from the FDA; (iii) INO-3107's financial prospects were greatly exaggerated; (iv) as a result, the Company's overall financial assertions were inaccurate; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis at all relevant times.

***The Truth Begins to Emerge***

72.     On August 8, 2024, the Company issued a press release reporting its financial results for the second quarter of 2024 (the "August 2024 Press Release"). The August 2024 Press Release announced an approximately full-year delay in the expected submission date for Inovio's INO-3107 BLA to the FDA, pushing the date back to mid-2025.

73.     The August 2024 Press Release claimed that "a manufacturing issue" with a component of INO-3107 was to blame, and quoted Defendant Shea as stating the following, in relevant part:

> We continue to make progress with our lead candidate, INO-3107, which has the potential to significantly improve the lives of patients with RRP. We expect all non-device related elements of our BLA package to be completed by year end and our pre-BLA meeting last week with the FDA provided us with confidence that we remain on the right track for the regulatory submission. However, as part of the testing process required for BLA submission, we've recently identified a

24

manufacturing issue with the single use disposable administration component of our device that we believe is resolvable, but will take additional time to rectify. . . . We're taking corrective steps to address the issue, and . . . we now expect to be able to submit the BLA in mid-2025.

74.     That same day, the Company hosted an earnings call (the "August 2024 Earnings Call"). During the August 2024 Earnings Call, the Company's Chief Medical Officer, Michael Sumner ("Sumner"), discussed the manufacturing issue with INO-3107 noted in the Q2 2024 Press Release. Sumner stated the following, in relevant part:

[W]e have unfortunately run into a manufacturing issue with a component of our CELLECTRA device. The single-use disposable administration component, otherwise known as the array. This is used to inject the DNA medicine and administer the electroporation. The issue stems from one of the plastic molded parts within this array and was identified during routine testing to support our BLA filing.

* * *

Our device teams with the support of our external component manufacturers are working to rapidly address the issue and then repeat the required testing for the array. The additional time needed for completing this work and testing has extended our anticipated timeline for BLA submission to mid-2025.

75.     Market analysts took swift notice of the Company's disclosures, with at least two analysts reducing their price targets for the Company's stock. The price per share of the Company's common stock fell $0.27, or approximately 3.1%, from a price per share of $8.71 at the close of trading on August 8, 2024, to close at $8.44 per share at the close of trading on August 9, 2024.

76.     That same day, Inovio filed a quarterly report on Form 10-Q with the SEC for the second quarter of 2024 (the "2Q24 10-Q"). Defendants Shea and Kies signed the 2Q24 10-Q and the attached SOX certifications, which attested to the accuracy of the statements contained therein.

77.     The 2Q24 10-Q contained the same boilerplate provisions pertaining to risk warnings as noted in the 3Q23 10-Q.

78.     On November 14, 2024, the Company issued a press release reporting its financial

results for the third quarter of 2024 (the "November 2024 Press Release"). The November 2024

Press Release continued to emphasize INO-3107's ability to improve the effectiveness of current

RRP treatments and satisfy unmet need, and quoted Defendant Shea, in relevant part, as follows:

> Our development of INO-3107 is supported by a growing body of research that collectively points to INO-3107's potential to be an important therapeutic option for all RRP patients regardless of the severity of their disease. We recently presented new immunology data highlighting the ability of INO-3107 to induce new populations of T cells that travel to the airway tissue and papilloma and correspond with clinical benefit. We've also presented our full safety and efficacy data, demonstrating that INO-3107 was shown to be well tolerated and have clinical benefit in the Phase 1/2 trial. Additionally, by the end of year, we anticipate announcing long-term clinical durability data. We continue to believe INO-3107 has the potential to become the preferred choice for the broadest number of RRP patients, healthcare providers and payors, if approved.

79.     That same day, Inovio filed a quarterly report on Form 10-Q with the SEC (the "3Q24 10-Q"). Defendants Shea and Kies signed the 3Q24 10-Q and the attached SOX certifications that attested to the accuracy of the statements contained therein.

80.     The 3Q24 10-Q contained the same boilerplate provisions pertaining to risk warnings as noted in the 3Q23 10-Q.

81.     On January 9, 2025, the Company issued a press release (the "January 2025 Press Release"). The January 2025 Press Release "highlight[ed] anticipated milestones for 2025 and key accomplishments from 2024 in advance of upcoming investor meetings." The January 2025 Press Release emphasized the Company's readiness pertaining to its submission of the INO-3107 BLA to the FDA, stating the following, in relevant part:

**INO-3107**

Anticipated Milestones for 2025

- Submit BLA to the [FDA] by mid-2025 and request priority review. INO-3107 could be the preferred non-surgical therapeutic option for [RRP] and would be the first DNA medicine approved for any indication in the United States, should it be approved.

- Resolution of previously announced single-use array manufacturing issue expected by February 2025. Next steps following resolution include completion of retesting process for the CELLECTRA® device and finalization of the device sections of the Chemistry, Manufacturing and Controls (CMC) module, which will be used to update the active Investigational New Drug (IND) Application for the confirmatory trial as well as the BLA submission.

* * *

- Submit a redosing study protocol to the FDA.
- Recently announced durability data support rationale for redosing patients with goal to maintain or improve clinical benefit.
- Present and publish recently announced durability data and immunology data, as well as the full efficacy and tolerability data from completed Phase 1/2 clinical trial, in a peer-reviewed scientific journal.

82.    On February 12, 2025, the Company issued a press release to report data from its Phase 1/2 clinical trial of INO-3107 (the "February 2025 Press Release"). According to the February 2025 Press Release, the data from the trial reinforced the strengths of INO-3107 regarding the improvement of current RRP treatments and satisfaction of unmet medical demand:

> In the trial, treatment with INO-3107 induced new populations of T cells in the blood that traveled to the airway and papilloma tissue and were correlated with a reduction in the number of post-treatment surgeries. Of the 32 patients in the trial, 26 patients (81%) required fewer surgeries post-treatment when compared to the year prior to treatment. INO-3107 treatment was also well tolerated in the trial. INOVIO plans to submit its [BLA] for INO-3107 in mid-2025 and request rolling submission and priority review under the FDA's accelerated approval program. If approved, INO-3107 would be the first DNA medicine approved for any indication in the United States.

83.    The February 2025 Press Release quoted Defendant Shea as stating:

> These important data characterizing the cytotoxic T cell-based mechanism of action of INO-3107, in conjunction with our recently reported durability data showing that clinical benefit continued to improve through year two and into year three after initial treatment, with half of patients not requiring any surgeries in year two, are part of the growing body of evidence that INO-3107 has the potential to be the preferred product of choice for both patients and healthcare providers. The primary goal for RRP patients is to reduce or eliminate the need for surgery and INO-3107 has the potential to do just that for the majority of patients. Every surgery matters and a safe and effective therapeutic alternative to surgery would be truly life-changing for RRP patients and their caregivers.

27

84.     On March 18, 2025, the Company issued a press release reporting its financial results for the fourth quarter of and full year 2024 (the "March 2024 Press Release"). The March 2024 Press Release announced that Inovio had resolved the manufacturing issue with INO-3107 and quoted Defendant Shea as follows:

> INOVIO's recent progress puts us on the cusp of achieving several long-term goals for our DNA medicines, most importantly the submission of our first BLA and potential transition to a commercial-stage company. . . . By resolving the previously announced device array component issue, we are back on track to submitting our first BLA for INO-3107 to the FDA. We anticipate starting our submission in mid-2025 with non-device related modules under the agency's rolling submission program, assuming it is granted, with the goal of having the complete submission accepted for priority review before the end of the year. We continue to believe that INO-3107 has the potential to be the preferred product candidate offering durable clinical benefit, tolerability and a patient-centric dosing regimen and are moving forward with urgency.

85.     On March 18, 2025, the Company filed an Annual Report on Form 10-K with the SEC for the fourth quarter and full year ended December 31, 2024 (the "2024 10-K"). The 2024 10-K was signed by each of the Individual Defendants. Appended to the 2024 10-K were SOX certifications, signed by Defendants Shea and Kies, attesting to the accuracy of the statements contained therein.

86.     The 2024 10-K stated, among other things, that "[i]n 2024, we continued to advance the development of our commercialization plans for INO-3107 in the United States based on the notification from the FDA that the data from our completed Phase 1/2 trial (RRP-001) could be used to submit a BLA under the FDA's accelerated approval program[,]" and reiterated that Inovio had "resolved the manufacturing issue in the first quarter of 2025 and [was] currently on track to begin a rolling submission of the BLA in mid-2025 and to request priority review[.]"

87.     The 2024 10-K also contained the same boilerplate provisions pertaining to risk warnings as noted in the 3Q23 10-Q.

*The 2025 Proxy Statement*

88.     On April 7, 2025, the Company filed a proxy statement on Schedule 14A with the SEC (the "2025 Proxy Statement"). Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth solicited proxies to vote at the annual stockholder meeting via the 2025 Proxy Statement.

89.     The 2025 Proxy Statement asked Inovio stockholders to vote to: (1) re-elect Defendants Shea, Benito, Dansey, Miller, Shepard, Weiner, Yarno, and Zoth to the Board; (2) approve, on an advisory basis, the compensation of the Company's named executive officers; and (3) approve an amendment and restatement to the Company's 2023 Omnibus Incentive Plan (the "2025 Amendment of the 2023 Omnibus Incentive Plan").

90.     The 2025 Proxy Statement told investors that the 2025 Amendment of the 2023 Omnibus Incentive Plan would, among other things, increase the aggregate number of shares of common stock available for grant by 2,200,000 shares and extend the term during which incentive stock options may be granted to February 27, 2035. The 2025 Proxy Statement stated that, as of March 24, 2025, 24,460 shares of common stock were still available for grant, meaning that if the 2025 Amendment of the 2023 Omnibus Incentive Plan were approved, the Company would have approximately 2,224,460 shares available for grant. The 2025 Proxy Statement stated that "[a]ll of our (including our affiliates') employees, non-employee directors and consultants are eligible to participate" in the 2025 Amendment to the 2023 Omnibus Incentive Plan. The 2025 Proxy Statement state4 that if the 2025 Amendment of the 2023 Omnibus Incentive Plan is not approved, the Company's incentive plan would continue to be administered in its current form.

91.     With respect to the "Board['s] Role in Risk Management[,]" the 2025 Proxy Statement stated the following:

29

The risk oversight function of our Board is carried out by both the Board and the Audit Committee. Management prepares and presents an annual business plan to the Board, which identifies risks associated with our operations and is reviewed quarterly by the Board. As provided in its charter, the Audit Committee meets periodically with management to discuss major financial and operating risk exposures and the steps, guidelines and policies taken or implemented related to risk assessment and risk management. Matters of strategic risk are considered by our Board. Each quarter management reports to the Audit Committee on legal, finance, accounting and tax matters. Our Board is provided with reports on legal matters at least quarterly and on other matters related to risk oversight on an as needed basis.

92. With respect to the Company's Code of Conduct, the 2025 Proxy Statement stated the following:

We have adopted a Code of Business Conduct and Ethics, which applies to all directors, officers and employees, including the principal executive officer, principal financial and accounting officer and controller. The purpose of the Code is to promote honest and ethical conduct. The Code of Business Conduct and Ethics is available on our website and is also available in print, without charge, upon written request to our corporate secretary at 660 W. Germantown Pike, Suite 110, Plymouth Meeting, Pennsylvania 19462. Any amendments to or waivers of the Code of Business Conduct and Ethics will be promptly posted on our website at www.inovio.com or in a report on Form 8-K, as required by applicable laws.

93. Regarding the Company's Audit Committee, the 2025 Proxy Statement stated the following, in relevant part:

The functions of the Audit Committee include retaining our independent registered public accounting firm, reviewing its independence, reviewing and approving the planned scope of our annual audit, reviewing and approving any fee arrangements with our independent registered public accounting firm, overseeing its audit work, reviewing and pre-approving any non-audit services that may be performed by it, reviewing the adequacy of accounting and financial controls, reviewing our critical accounting policies and reviewing and approving any related party transactions. The Audit Committee acts pursuant to a written charter that is available on our corporate website at: http://www.inovio.com.

94. The 2025 Proxy Statement was materially misleading because it failed to disclose that: (i) although Inovio claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants were actively violating the Code of Conduct at the time; (ii) contrary to the

2024 Proxy Statement's descriptions of the Board's risk oversight responsibilities, the Board and its committees did not adequately exercise these functions and were causing or permitting Inovio to issue false and misleading statements; and (iii) the Individual Defendants allowed Defendants Shea and Kies to sell stock at artificially inflated prices while in possession of material nonpublic information.

95.     Further, the 2025 Proxy Statement failed to disclose that: (i) the Company lacked a sufficient basis to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (ii) Defendants knew the INO-3107 BLA would be unlikely to receive accelerated approval or priority review from the FDA; (iii) INO-3107's financial prospects were greatly exaggerated; (iv) as a result, the Company's overall financial assertions were inaccurate; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis at all relevant times.

96.     On May 13, 2025, the Company issued a press release to announce its financial results for the first quarter of 2025 (the "May 2025 Press Release"). The May 2025 Press Release stated the following, in relevant part:

- Clinical and immunological results from Phase 1/2 trial of INO-3107 published in Nature Communications in February 2025
- INO-3107 induced new populations of T cells in the blood that traveled to airway tissue and were associated with significant clinical benefit as measured by reduced need for surgery

* * *

INOVIO plans to begin rolling submission of the BLA in mid-2025 under FDA's accelerated approval program, subject to FDA concurrence, with the goal of completing the submission in the second half of 2025 and receiving FDA acceptance of the submission by the end of the year. FDA has previously awarded breakthrough therapy designation for INO-3107 and INOVIO plans to request priority review of its BLA, which if granted would allow for an FDA approval decision (PDUFA date) in mid-2026.

31

97.     The May 2025 Press Release also quoted Defendant Shea as stating the following, in relevant part:

> As previously stated, our goal is to begin rolling submission in mid-2025, complete the submission in the second half of 2025 and receive file acceptance from the FDA by year end. If we receive priority review, it could allow for a PDUFA date in mid-2026. Based on market research, we believe INO-3107 could be the preferred product for patients and providers, if approved.

98.     Also on May 13, 2025, the Company filed a quarterly report on Form 10-Q with the SEC for the first quarter of 2025 (the "1Q25 10-Q"). Defendants Shea and Kies signed the 1Q25 10-Q and the attached SOX certifications, which attested to the accuracy of the statements contained therein.

99.     The 1Q25 10-Q also contained the same boilerplate provisions pertaining to risk warnings as noted in the 3Q23 10-Q.

100.    The Company announced its financial results for the second quarter of 2025 in a press release issued on August 12, 2025 (the "August 2025 Press Release"). The August 2025 Press Release stated the following, in relevant part:

> INOVIO completed the DV [design verification] testing for the CELLECTRA 5PSP device and requested in July 2025 that the FDA allow it to begin submitting its BLA on a rolling basis based on the Breakthrough Therapy designation previously granted to INO-3107. INOVIO anticipates completing its submission over the next several months and requesting a priority review. FDA inspection of INOVIO as clinical sponsor of the Phase 1/2 trial was successfully completed. The company is working on the device-related sections for its BLA and updating its active IND [Investigational New Drug application] so it can begin enrolling patients into its placebo-controlled, randomized confirmatory trial, which will include 100 patients and be conducted at approximately 20 sites across the United States.
>
> Data from a retrospective study (RRP-002) investigating the long-term clinical efficacy of patients treated with INO-3107 have been published in a peer-reviewed journal, *The Laryngoscope*. The data demonstrate that INO-3107 provided significant clinical benefit to RRP patients, as measured by reduction in surgery, that continued to improve in years two and three following initial treatment.

101.   That same day, the Company filed a quarterly report on Form 10-Q with the SEC for the second quarter of 2025 (the "2Q25 10-Q"). Defendants Shea and Kies signed the 2Q25 10-Q and the attached SOX certifications, which attested to the accuracy of the statements contained therein.

102.   The 2Q25 10-Q also contained the same boilerplate provisions pertaining to risk warnings as noted in the 3Q23 10-Q.

103.   On August 26, 2025, the Company issued a press release regarding the submission timeline for the INO-3107 BLA (the "August 2025 Press Release"). The August 2025 Press Release "announced that the FDA has notified INOVIO that it agrees with its rolling submission timeline for the BLA for INO-3107 as a treatment for adults with [RRP]" and that the Company "anticipates completing its submission to the FDA in the coming months and requesting priority review, with the goal of file acceptance by the FDA by the end of 2025."

104.   The August 2025 Press Release quoted Defendant Shea as stating the following:

We are pleased the FDA agreed to our rolling submission plan. We are also encouraged by their recent activity in recognizing the importance of accelerating the full approval of new technologies that can bring life-changing therapeutic options to patients suffering from rare diseases such as RRP. Based on the totality of our data, we believe INO-3107 has the potential to become the preferred product for the treatment of RRP by patients and providers. We are leveraging our Breakthrough Therapy designation for INO-3107 to continue discussions with the FDA on the pathway to approval as we aim to bring our positively differentiated therapeutic option to patients as quickly as possible.

105.   On November 3, 2025, the Company issued a press release regarding its rolling submission of the INO-3107 BLA (the "November 2025 Press Release"). The November 2025 Press Release stated the following, in relevant part:

- [RRP] is a rare HPV-related disease of the respiratory tract with significant unmet need
- INO-3107 previously received Orphan Drug and Breakthrough Therapy designations; BLA submitted under FDA's Accelerated Approval program

33

- Expect to receive file acceptance by year end 2025 with potential PDUFA date in mid-2026 if request for priority review granted

* * *

INOVIO submitted the BLA under the FDA's Accelerated Approval program and has requested a priority review, which if granted, is expected to be completed within six months following the 60-day filing period. If approved, INO-3107 would be INOVIO's first commercial product and the first DNA medicine available in the United States.

106.    On November 10, 2025, the Company issued a press release to announce its financial results for the third quarter of 2025 (the "November 2025 Press Release"). The November 2025 Press Release stated that the Company had "submitted the BLA under the FDA's accelerated approval program and has requested a priority review, which if granted, is expected to be completed within six months following file acceptance."

107.    The November 2025 Press Release quoted Defendant Shea as stating the following, in relevant part:

I'm very pleased to report that we've completed the rolling submission of our BLA for lead candidate INO-3107. We believe every patient deserves a treatment that reduces exposure to surgery and INO-3107 has the potential to meet that significant need in the RRP community. The majority of patients in our Phase 1/2 trial needed fewer surgeries after treatment and showed continued improvement through Year 2 without additional doses, and without surgical interventions during the treatment window to maintain minimal residual disease as required by other treatment modalities[.]

108.    Also on November 10, 2025, the Company filed a quarterly report on Form 10-Q with the SEC for the third quarter of 2025 (the "3Q25 10-Q"). Appended to the 3Q25 10-Q were SOX certifications, signed by Defendants Shea and Kies, attesting to the accuracy of the statements contained therein.

109.    The 3Q25 10-Q stated the following, in relevant part:

Utilizing our breakthrough therapy designation, we requested rolling submission of our [INO-3107] BLA in July 2025 and reported in November 2025 that we had completed the BLA submission, with the goal of receiving file acceptance by the

34

FDA by the end of 2025. We have requested a priority review from the FDA, which, if granted, is expected to be completed within six months following the 60-day filing period.

During 2025, we have presented key data regarding INO-3107 at several scientific conferences. Highlights from the data include:

- 81% (26/32) of patients experienced a reduction of one or more surgeries at Year 1 post-treatment

- By the end of Year 2, 91% (21/23) of evaluable patients continued to experience a reduction of one or more surgeries. Only two patients had not yet responded to treatment with INO-3107

- INO-3107 demonstrated continued clinical benefit, with a persistent decline in the mean number of surgeries through Year 2 post-therapy: A 78% reduction in mean annual surgeries was seen at Year 2 compared to the 1 year pre-treatment period (0.9, n=28 vs 4.1, n=32)

- Clinical response was not dependent upon low viral loads, molecular subtype or other elements of the papilloma microenvironment

110. The 3Q25 10-Q also contained the same boilerplate provisions pertaining to risk warnings as noted in the 3Q23 10-Q.

111. The foregoing statements were materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (i) the Company lacked a sufficient basis to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (ii) Defendants knew the INO-3107 BLA would be unlikely to receive accelerated approval or priority review from the FDA; (iii) INO-3107's financial prospects were greatly exaggerated; (iv) as a result, the Company's overall financial assertions were inaccurate; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis at all relevant times.

***The Truth Fully Emerges***

112.   The full truth finally emerged on December 29, 2025, when the Inovio issued a press release announcing that the FDA had not classified the INO-3107 BLA for Accelerated Approval (the "December 2025 Press Release"). The December 2025 Press Release explained that the FDA had accepted the INO-3107 BLA on the standard timeline, conceding that the FDA had indicated Inovio had not provided sufficient information to merit approval for an accelerated timeline. The December 2025 Press Release also stated:

> The FDA assigned INO-3107 a Prescription Drug User Fee Act (PDUFA) review goal date of October 30, 2026, which is the date by which it intends to take action on the application. The FDA has indicated that it is not currently planning to hold an advisory committee meeting to discuss this application.
>
> INOVIO filed its BLA under the accelerated approval pathway. In the file acceptance letter, the FDA noted as a potential review issue its preliminary conclusion that the company has not submitted adequate information to justify eligibility for the accelerated approval pathway. INOVIO continues to believe that INO-3107 provides a meaningful therapeutic benefit over existing treatments and fulfills the criteria for accelerated approval. INOVIO plans to request a meeting with FDA to discuss next steps to remain eligible under the accelerated approval program. INOVIO is not currently planning to seek approval for INO-3107 under the traditional pathway.

113.   On this news, the price of the Company's stock declined, dropping $0.56 per share, or approximately 24.5%, from a close of $2.29 per share on December 26, 2025, to close at $1.73 per share on December 29, 2025.

## THE INDIVIDUAL DEFENDANTS SOLD COMPANY STOCK AT ARTIFICIALLY INFLATED PRICES

114.   As a result of the false and misleading statements the Individual Defendants caused Inovio to make, the Company's share price was artificially inflated. Defendants Shea and Kies, while in possession of material, nonpublic information, capitalized on the artificially inflated stock price by selling 49,444 shares of Inovio common stock for total gross proceeds of approximately

36

$276,362. These insider sales, made with knowledge of material, nonpublic information, demonstrate their motive in facilitating and participating in the wrongdoing.

115.    During the Relevant Period, Defendant Shea made the following sales while the Company's stock price was artificially inflated:

| Date of Transaction | Average Share Price | Shares | Gross Proceeds |
| --- | --- | --- | --- |
| 2/26/2024 | $8.16 | 3,728 | $30,420.48 |
| 5/10/2024 | $10.65 | 2,392 | $25,474.80 |
| 5/15/2024 | $13.07 | 7,718 | $100,874.26 |
| 2/26/2025 | $1.98 | 11,581 | $22,930.38 |
| 5/10/2025 | $1.80 | 2,392 | $4,305.60 |
| 5/15/2025 | $1.95 | 7,717 | $15,048.15 |
| **Total** | | **35,528** | **$199,053.67** |

116.    During the Relevant Period, Defendant Kies made the following sales while the Company's stock price was artificially inflated:

| Date of Transaction | Average Share Price | Shares | Gross Proceeds |
| --- | --- | --- | --- |
| 2/26/2024 | $8.16 | 3,466 | $28,282.56 |
| 5/15/2024 | $13.07 | 2,562 | $33,485.34 |
| 2/26/2025 | $1.98 | 5,322 | $10,537.56 |
| 5/15/2025 | $1.95 | 2,566 | $5,003.70 |
| **Total** | | **13,916** | **$77,309.16** |

### DAMAGES TO INOVIO

117.    As a direct and proximate result of the Individual Defendants' misconduct, Inovio has expended and will continue to expend significant sums of money.

118.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

119.    Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken

against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

120. Inovio has also suffered, and will continue to suffer, a loss of reputation and goodwill as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward due to their misrepresentations.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

121. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

122. Plaintiff brings this action derivatively in the right and for the benefit of Inovio to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, unjust enrichment, violations of Section 14(a) of the Exchange Act, and other wrongful conduct as alleged herein.

123. Plaintiff has owned Inovio common stock since before the beginning of the Relevant Period and has continuously been an owner of Company stock during all relevant times.

124. Plaintiff will adequately and fairly represent the interests of Inovio and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

125. A pre-suit demand on the Board is futile and therefore excused. At the time this action was commenced, the Board consisted of eight directors – Defendants Benito, Dansey, Miller, Shea, Shepard, Weiner, Yarno, and Zoth (the "Director Defendants"). All eight members of the Board are incapable of exercising independent objective judgment and/or making an independent and disinterested decision about whether to institute and vigorously prosecute this action.

38

126. The Director Defendants all face a substantial likelihood of liability for their individual misconduct, as they were directors during the time of the false and misleading statements and as such had a fiduciary duty to ensure that Inovio's SEC filings, press releases, and other public statements and presentations on behalf of Inovio concerning its business, operations, prospects, internal controls, and financial statements were accurate.

127. The Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that Inovio was acting legally and its internal controls were sufficiently robust and effective, and to ensure that the Board's duties were being discharged in good faith and with the required diligence. Instead, they reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused Inovio's stock to trade at artificially inflated prices.

128. The Director Defendants knowingly and consciously allowed the authorization of false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that Inovio's internal controls were sufficiently robust and effective, and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence. These knowing and conscious failures breached the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability.

129. The Director Defendants will not bring a suit on behalf of Inovio to recover damages sustained because of this misconduct because they would expose themselves to significant liability. As such, demand is futile as to the Director Defendants.

130. Defendant Shea is not disinterested or independent and is therefore incapable of considering a demand. Defendant Shea has served as its CEO since 2022 and is therefore not

39

independent or disinterested under Nasdaq Listing Rule 5605(a)(2). Moreover, Defendant Shea cannot reasonably be expected to consider with disinterestedness whether to sue fellow directors of the Company at which she serves as the lead executive.

131.   Furthermore, Defendants Shea and Kies are not disinterested or independent because they are named as defendants, and face significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

**Additional Reasons Demand is Futile**

132.   Defendants Benito, Shepard, and Zoth served as members of the Audit Committee during the Relevant Period. The Audit Committee is required to oversee, among other things, the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein. In violation of the Charter, Defendants Benito, Shepard, and Zoth failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, Defendants Benito, Shepard, and Zoth further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

133.   Inovio has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused Inovio to take action to recover the damages Inovio has suffered and will continue to suffer thereby.

134.   In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause Inovio

40

to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

135.    The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

136.    The Director Defendants' conduct described herein could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of Inovio. Accordingly, demand is excused as being futile.

137.    Publicly traded companies, such as Inovio, typically carry director and officer liability insurance from which Inovio could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover Inovio's damages. If no

41

such insurance is carried, then the Director Defendants will not cause Inovio to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

138.    Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## CLAIM I

### Against The Individual Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9

139.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

140.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

141.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

142.    Under the direction and watch of the Individual Defendants, the 2024 Proxy

Statement and the 2025 Proxy Statement failed to disclose that the Individual Defendants had violated the Code of Conduct and that the Board's risk oversight mechanisms were evidently inadequate given the aforementioned misconduct.

143.    The 2024 Proxy Statement and the 2025 Proxy Statement also failed to disclose that: (i) the Company lacked a sufficient basis to justify the INO-3107 BLA's eligibility for FDA accelerated approval or priority review; (ii) Defendants knew the INO-3107 BLA would be unlikely to receive accelerated approval or priority review from the FDA; (iii) INO-3107's financial prospects were greatly exaggerated; (iv) as a result, the Company's overall financial assertions were inaccurate; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis at all relevant times.

144.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Statement Proxy and the 2025  Statement Proxy were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement and the 2025 Proxy Statement.

145.    Inovio    was    damaged    because    of    the    Individual    Defendants'    material misrepresentations and omissions in the 2024 Proxy Statement and the 2025 Proxy Statement.

146.    Plaintiff, on behalf of Inovio, has no adequate remedy at law.

## CLAIM II

### Against the Individual Defendants for Breach of Fiduciary Duties

147.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

43

148. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

149. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision.

150. The Individual Defendants knowingly issued false financial statements and made false and misleading statements regarding Inovio's business operations, practices, and international controls in connection therewith, as alleged herein. These actions could not have been a loyal and good faith exercise of prudent business judgment to protect and promote Inovio's corporate interests.

151. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Inovio has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

152. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

153. Plaintiff, on behalf of Inovio, has no adequate remedy at law.

## CLAIM III

### Against the Individual Defendants for Gross Mismanagement

154. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

155. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties

44

with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

156.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Inovio has sustained significant damages in excess of hundreds of millions of dollars and will continue to sustain significant damages.

157.    Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

158.    Plaintiff, on behalf of Inovio, has no remedy at law.

## CLAIM IV

### Against the Individual Defendants for Waste of Corporate Assets

159.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

160.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

161.    As a result of the misconduct described above, and by failing to properly consider the interests of Inovio and its public shareholders, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; (iii) incurring potentially millions of dollars of legal liability and/or legal costs to investigate and defend Defendants' unlawful actions; and (iv) causing the loss of financing from investors and business from future customers who no longer trust Inovio and its products.

162.    As a result of the waste of corporate assets, the Individual Defendants are liable to

the Company.

163.    Plaintiff, on behalf of Inovio, has no adequate remedy at law.

## CLAIM V

### Against the Individual Defendants for Unjust Enrichment

164.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

165.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Inovio.

166.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

167.    Additionally, at the time of their stock sales set forth herein, Defendants Shea and Kies knew of the information described above, and sold Inovio common stock on the basis of such information. Their sales of Inovio common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

168.    Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## CLAIM VI

46

**Against Defendants Shea and Kies for Insider Selling**

169.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170.    By reason of their fiduciary roles as officers, directors, and/or controlling persons of Inovio, Defendants Shea and Kies (the "Insider Selling Defendants") specifically owed Inovio the highest obligation of due care, good faith, and loyalty.

171.    As officers, directors, and/or controlling persons of the Company, the Insider Selling Defendants were given access, directly or indirectly, to material information about the Company, as described above, which was not generally available to the public.

172.    When the Insider Selling Defendants sold their Company stock, as detailed *supra*, they were in possession of material, non-public information, and sold Company stock on the basis of such information; information which they each knew had a significant effect on the market price of the Company's stock.

173.    The information described above was proprietary, non-public information concerning the Company's business operations and financial condition. It was a proprietary asset belonging to Inovio, which the Insider Selling Defendants misappropriated to their own benefit when they sold holdings in Company stock. The Insider Selling Defendants knew that this information was not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of Company stock.

174.    As the use of Inovio's proprietary information for their own personal gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, Inovio is entitled to disgorge any illegal profits obtained thereby.

**REQUEST FOR RELIEF**

47

WHEREFORE, Plaintiff demands judgment as follows:

A.      Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.      Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.      Awarding punitive damages;

D.      Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: May 1, 2026                      Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/ Jacob A. Goldberg*
Jacob A. Goldberg
101 Greenwood Avenue, Suite 520
Jenkintown, PA 19046
Telephone: (215) 600-2817

Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827

Email: philkim@rosenlegal.com

*Counsel for Plaintiff*

Docusign Envelope ID: B044E9C5-6F7A-42CC-97B4-2F532CAA5734E

## **VERIFICATION**

I, Michael Panes am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.    5/1/2026

DocuSigned by:

MICHAEL PANES

D8F907B455A34B9...

Michael Panes